Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Edward A. Bobrick | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6188 | **DATE** | 3/18/2003 |
| **CASE TITLE** | Christopher G. Bowman, D.O. vs. Reliance Standard Life Ins Company | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiff's Motion for Summary Judgment [8-1] is granted. Defendant's Motion for Summary Judgment [16-1] is denied. Enter Memorandum Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices — | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | MAR 21 2003 | |
| | Notified counsel by telephone. | | | date docketed | 17 |
| | Docketing to mail notices. | | | | |
| ✓ | Mail AO 450 form. | | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 3/19/2003 | |
| SRB | courtroom deputy's initials | | 03 MAR 20 PM 6:07 | date mailed notice | |
| | | | FILED | SB7 | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER G. BOWMAN, D.O., | ) | **DOCKETED** |
| | ) | MAR 2 1 2003 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 02 C 6188 |
| | ) | |
| RELIANCE STANDARD LIFE | ) | Edward A. Bobrick, |
| INSURANCE COMPANY, | ) | Magistrate Judge |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM ORDER

Before the court is the motion of plaintiff Christopher Bowman for summary judgment on his complaint against defendant Reliance Standard Life Insurance Company.

### I. BACKGROUND

Plaintiff brings this suit under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(a)(1)(B), challenging the defendant's denial of his claim for long term disability benefits. From August 1, 1988, until March 26, 2000, plaintiff was employed as a physician at the Dreyer Medical Clinic, and was covered by a group long term disability plan that defendant issued. When plaintiff stopped working, he made a claim for total disability due to cervical spine injuries causing severe pain and limitations in the use of his dominant hand. Defendant denied the claim, and continued to do so throughout the administrative appellate process.

1 7

# I. FACTS

In this case, both parties have filed the requisite Local Rule 56.1[1] submissions in this

summary judgment proceeding. We rely on these submissions in our analysis; it is not the

court's task to scour the record in search of evidence to support or defeat a motion for

summary judgment. *Brasic v. Heinemann's, Inc.*, 121 F.3d 281, 285 (7th Cir.1997). The

nonmoving party must identify with reasonable particularity the evidence upon which she

claims rely in order to stave off summary judgment. *Id.* The two issues in this case are the

---

[1] Rule 56.1(a) requires the party moving for summary judgment to file, among
other items, a "statement of material facts as to which the moving party
contends there is no genuine issue and that entitle the moving party to a
judgment as a matter of law." Local Rule 56.1(a)(3). The required statement
is to consist of short numbered paragraphs, including within each paragraph
specific cites to the record which support the facts set forth. *Id.* Rule 56.1(b)
then requires the opposing party to file among other items:

> a concise response to the movant's statement that shall contain:
> (A) a response to each numbered paragraph in the moving
> party's statement, including, in the case of any disagreement,
> specific references to the affidavits, parts of the record, and
> other supporting materials relied upon, and (B) a statement,
> consisting of short numbered paragraphs, of any additional facts
> that require the denial of summary judgment, including
> references to the affidavits, parts of the record, and other
> supporting materials.

Local Rule 56.1(b)(3). Rule 56.1(b) further provides that "all material facts
set forth in the statement required of the moving party will be deemed to be
admitted unless controverted by the statement of the opposing party." *Id.* The
district court, with the approval of the Seventh Circuit, has long enforced the
requirements of these rules. *Markham v. White*, 172 F.3d 486, 490 (7th Cir.
1999) (discussing Local General Rule 12, the predecessor to Rule 56.1).

demands of plaintiff's occupation, and the extent of plaintiff's limitations as a result of his injury.

Plaintiff worked at the Dreyer Medical Clinic as an urgent care physician. This position required him to have good use of both his hands and arms, particularly his dominant right hand, for grasping, reaching and fine manipulating as well as for writing, including prescriptions and mandatory progress/treatment notes. (*Plaintiff's Statement of Facts*, ¶ 7 (*citing* Vocational Report, Ex. B)). Defendant's response to this assessment of plaintiff's job is somewhat equivocal, revealing that the parties disagree over the requirements of plaintiff's occupation.

Defendant admits that plaintiff worked as a *physician*, as opposed to an *urgent care physician*, but cites exhibit RSL 0056, which indicates plaintiff was an urgent care physician. (*Defendant's Response and Counter Statement of Material Facts*, ¶ 7 (*citing* RSL 0056)). Defendant further admits that plaintiff had to use his hands and arms to perform his job, but denied plaintiff's assertions to the extent they imply plaintiff was disabled from using his hands and arms and was therefore unable to perform the material duties of his occupation. (*Defendant's Response and Counter Statement of Material Facts*, ¶ 7). Defendant also objects to plaintiff's reliance on the Vocational Report, which was not part of the administrative record. (*Id.*).

According to defendant, plaintiff was a General Practitioner. (*Defendant's Statement of Facts*, ¶ 12). Relying on the Dictionary of Occupational Titles, defendant states that this occupation is considered light duty, and repetition of activity is not required. (*Defendant's*

3

*Statement of Facts*, ¶ 12 ). Reference to the Dictionary of Occupational Titles also reveals

that the General Practitioner must have the capacity to perform the following activities:

> Reaching: Frequently - Exists from 1/3 to 2/3 of the time
>
> Handling: Frequently - Exists from 1/3 to 2/3 of the time
>
> Fingering: Frequently - Exists from 1/3 to 2/3 of the time
>
> Feeling: Occasionally - Exists up to 1/3 of the time

Dictionary of Occupational Titles, Code Number 070.101-022. Plaintiff points to these

requirements in response to defendant's somewhat briefer description of the job's

requirements. (*Plaintiff's Response to Defendant's Statement of Facts*, ¶ 14 (RSL 0086).

Plaintiff also reasserts that he was an Urgent Care Physician.

As a benefit of his employment, plaintiff was covered under a long term disability

plan, underwritten by defendant. Under the applicable plan:

> "Totally Disabled" and "Total Disability" mean . . .that as a result of an Injury
> or Sickness . . . an Insured cannot perform the material duties of his/her regular
> occupation.

(*Plaintiff's Statement of Facts*, ¶ 10 (*citing* RSL 0003)). The plan defines "Partially

Disabled" to mean:

> that as a result of an Injury or Sickness an Insured is capable of performing the
> material duties of his/her occupation on a part-time basis or some of the
> material duties on a full-time basis. An Insured who is Partially Disabled
> during the Elimination Period will be considered Totally Disabled except
> during the Elimination Period.

(*Plaintiff's Statement of Facts*, ¶12 (*citing* RSL 0003)). The document upon which plaintiff

relies for these definitions, RSL 0003, is not the plan itself but a letter from defendant's

offices to a Mr. Hull, who was apparently plaintiff's counsel at the time. Plaintiff misquotes the letter slightly, which actually reads:

> that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her occupation on a part-time basis or some of the material duties on a full-time basis. An Insured who is Partially Disabled will be considered Totally Disabled except during the Elimination Period.

(RSL 0003). In addition, the letter also provides that, in order to receive benefits, the insured must be "under the regular care of a physician," and "submit[] satisfactory proof of Total Disability to [defendant]." (RSL 0003).

Plaintiff filed a claim for long term disability benefits with defendant on March 12, 2000. He alleged that he was disabled due to pain in his neck and shoulder and a lack of fine hand control. (*Plaintiff's Statement of Facts*, ¶14 (*citing* RSL 007-78)). On March 20, 2000, plaintiff underwent an EMG/nerve conduction study of his right arm. (RSL 0159). The results were essentially normal, although there were some changes noted that were compatible with a C5-6 distribution radicular process. (RSL 0159). At that time, plaintiff's treating physician, Dr. Ronald Bosch, a neurosurgeon, noted that the range of motion in plaintiff's neck was pretty good. (RSL 0157). Plaintiff's grasp was weaker on the right, and his right biceps reflexes were hyperactive. (RSL 0157).

Dr. Bosch completed a report for defendant on May 2, 2000, in which he diagnosed plaintiff with cervical foraminal stenosis with cervical radiculopathy, resulting in neck and right shoulder pain and lack of hand control. (RSL 0164). Dr. Bosch stated that plaintiff was unable to work beginning March 27, 2000, and that a return to work was indefinite. (RSL

0165). The doctor felt plaintiff had the following restrictions and limitations: lift or carry a maximum of ten pounds, reach above the shoulder only occasionally (0-33%); and an inability to perform simple grasping with the right hand. (RSL 0165). Curiously, Dr. Bosch found plaintiff had no difficulty performing fine manipulation with his right hand. (RSL 0165).

Plaintiff underwent an MRI of the cervical spine on April 10, 2000. (RSL 0162). The findings were:

> 1. At the C6-7 level, there is a mild right paramedian disc protrusion. This, in conjunction with asymmetric endplate/uncovertebral joint spurring, causes mild right paramedian stenosis and right-sided neural foraminal narrowing. This disc protrusion was not present on a previous exam from 9/97 where only mild asymmetric disc bulging was present.
>
> 2. Redemonstration of asymmetric right-sided endplate/uncovertebral joint spurring and associated disc bulge at the C5-6 level causing mild right paramedian stenosis and right-sided neural foraminal narrowing.
>
> 3. Redemonstration of several left cervical lymph nodes. These are stable when compared to the 1997 study and do not meet the size criteria for pathologic enlargement.

(RSL 0162-63).

On May 10, 2000, another treating neurosurgeon, Dr. Martin Gryfinski, examined plaintiff. While he found strength to be "pretty good," he noted that plaintiff had a very limited range of motion in his neck, and tended not to tolerate extension or lateral flexion in either direction. (RSL 0158). Based on plaintiff's MRI, Dr. Gryfinski felt plaintiff was a candidate for surgery, but plaintiff declined. (RSL 0159). On May 19, 2000, Dr. Bosch again reported that plaintiff's grasp was weaker on the right, although reflexes were more

6

symmetrical than in the previous examination. (RSL 0156). He noted that the MRI showed a mild disc herniation at C6-7. (RSL 0156).[2] Dr. Bosch provided plaintiff with a letter dated February 14, 2001 (RSL 0142-43), in which he noted that plaintiff "apparently is unable to write and cannot do a variety of minor surgical procedures." (RSL 0143). Dr. Bosch wrote that it was his opinion that plaintiff could not perform the material duties of his regular occupation. (RSL 0143).

Dr. Brian Shaughnessy examined plaintiff on February 14, 2001, and noted a decreased range of motion in the neck. (RSL 0145).[3] At that time, plaintiff told the doctor that anti-inflammatory medications, muscle relaxants, two cervical epidural steroids, and physical therapy had been unsuccessful. (RSL 0144). Dorsiflexion caused pain in the cervical and trapezius regions. (R. 0145). Spurling's maneuver was positive for cervical nerve root disorder. (*Plaintiff's Statement of Facts*, ¶14n.4; RSL 0145). Palpitation of the right side of the cervical paravertebral region elicited pain. (RSL 0145). Dr. Shaughnessy noticed slight atrophy of the infraspinatus muscle consistent with a C5-6 degenerative process. (RSL 0145-46). There was decreased sensation to pin prick in the right radial forearm. (RSL 0145). Power in the upper extremities was normal, including deltoids, trapezius, biceps, triceps, wrist extension, finger abduction, and grip and finger extension.

---

[2]    Defendant argues that the MRI did *not* show a disc herniation, but fails to explain this interpretation. (*Defendant's Response and Counter Statement of Facts*, ¶ 15). The MRI specifically stated, however, that there was a mild disc protrusion at C6-7. (RSL 0162).

[3]    Throughout his submissions on this matter, plaintiff refers to this report as being produced by Dr. Bosch. (*Plaintiff's Statement of Facts*, ¶16).

(RSL 0145). Dr. Shaughnessy felt signs and symptoms were consistent with cervical radiculitis. (RSL 0146).

On May 10, 2001, plaintiff underwent a functional capacity evaluation conducted by a physical therapist, Angel Cassidy. (*Plaintiff's Statement of Facts*, ¶18). She reported that plaintiff could occasionally reach with his left arm, but could reach above shoulder level with his right arm less than occasionally, and below shoulder level less than frequently. (*Plaintiff's Statement of Facts*, ¶18 (*citing* RSL 0123)). Plaintiff could drive only occasionally. (*Id.*). He was unable to use his right hand for repetitive grasping, pushing, pulling or fine manipulations, or on a non-repetitive basis for pushing, pulling, or fine manipulation. (*Id.*). The therapist noticed that plaintiff used his left hand when writing, but signed his name with his right hand. (*Plaintiff's Statement of Facts*, ¶18 (*citing* RSL 0130)). Plaintiff could sustain a pinch grip with his right hand for just ten seconds compared with 30 seconds on the left before complaining of pain. (RSL 0133). While he was able to repetitively perform fine manipulations with his left hand on small objects – nuts, bolts toothpicks, BB pellets – he was unable to do so with his right hand. (*Id.*). He was also unable to complete a pegboard test with his right hand. (*Id.*). Defendant contends this fails to accurately depict the conclusions of the therapist, but fails to suggest where it believes these conclusions fall short, let alone to support its interpretation with a citation to the record. (*Defendant's Response and Counter Statement of Facts*, ¶ 18).

The defendant denied plaintiff's claim in a letter dated August 11, 2000. (RSL 0040-42). Plaintiff appealed this decision on September 19, 2000, requesting a 60-day extension

on the usual 60-day limit on requests for review. (RSL 0038). Stating that there was difficulty in obtaining additional medical evidence on December 19, 2000, plaintiff requested another 60-day extension, which defendant allowed on January 4, 2001. (RSL 0033-34). Plaintiff apparently failed to submit further evidence in that additional time.

On June 12, 2001, Dr. William Hauptman completed a review of plaintiff's file for defendant as of that time. (RSL 0104-0109). Dr. Hauptman felt that the medical records documented restrictions and limitations only referable to the right upper extremity, in that plaintiff was restricted from repetitive use of the right upper extremity and was unable to lift more the ten pounds. (RSL 00108). Dr. Hauptman concluded that it was his opinion that:

> the [plaintiff] is able to use his right upper extremity for non-repetitive, only intermittent, simple grasping, pushing, pulling and fine manipulation. The plaintiff's treating neurosurgeon Christopher Cascino, M.D. stated appropriately on March 17, 1998 that the [plaintiff] could continue working full-time "with his only restriction being avoiding procedures such as lacerations and the like while at work."

> It is my opinion within a reasonable degree of medical certainty that the medical records do not support impairment predicated exclusively upon [plaintiff] complaints of pain.

(RSL 0108-09).

Defendant then upheld its denial of plaintiff's claim on June 25, 2001. As a rationale for denying benefits, defendant stated that plaintiff could perform the occupation of "General Practitioner." (*Plaintiff's Statement of Facts*, ¶24 (*citing* RSL 0004)). In a memorandum to a senior benefit analyst, Denise Heim, a rehabilitation counselor, Robert Pare, sets forth that the Dictionary of Occupational Titles' description of General Practitioner "encumbers[sic]

one to have the ability to reach, handle, and finger on a frequent basis, and feel on an occasional basis." (*Plaintiff's Statement of Facts*, ¶24 (*citing* RSL 0086)). Mr. Parc noted that repetitive activity was not identified as part of the occupation of General Practitioner. (*Plaintiff's Statement of Facts*, ¶24 (*citing* RSL 0086).

On August 19, 2002, plaintiff submitted a vocational report to defendant from Thomas Grzesik, and requested that defendant reopen plaintiff's claim. (*Plaintiff's Statement of Facts*, ¶25). Mr. Grzesik reviewed, among other things, Ms. Cassidy's vocational report, and felt she indicated that plaintiff was unable to use his right upper extremity for any type of work activity, but failed to make this clear in her summary. (*Plaintiff's Statement of Facts*, ¶25(*citing* Ex. B, at 13)). In addition, he noted that Dr. Hauptman indicated that plaintiff was restricted from using his right arm for repetitive, but not occasional non-repetitive simple grasping, pushing, pulling or fine manipulation which, according to Mr. Grzesik, would disable plaintiff "from performing his job as an Urgent Care Physician with Dreyer Medical Clinic." (*Plaintiff's Statement of Facts*, ¶28 (*citing* Ex. B, at 20)). Mr. Grzesik felt that plaintiff had been at least partially disabled since he was required to cut back on certain procedures in 1997. (*Plaintiff's Statement of Facts*, ¶25 (*citing* Ex. B, at 21). Defendant did not reopen plaintiff's case, and this litigation resulted.

## II. ANALYSIS

### A. Summary Judgment

Summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.

56(c). To ward off summary judgment by showing that there is a genuine dispute on a material fact, the non-moving party must do more than raise a "metaphysical doubt" as to the fact's existence. *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir.1997). The non-moving party cannot merely allege the existence of a factual dispute. *McPhaul v. Board of Com'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000). That party must supply evidence sufficient to allow a jury to render a verdict in their favor. *Id.*

## B. ERISA

A court reviews a plan administrator's denial of benefits *de novo* unless the plan gives the administrator discretionary authority to determine eligibility for benefits. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948 (1989); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 773 (7th Cir. 2003). The parties here agree that a *de novo* review is applicable. That means the court must determine if the defendant's decision was "merely incorrect," as opposed to whether it was unreasonable, which would be the standard if the defendant had discretionary authority. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000). In addition, the court is not limited to considering evidence that was before the plan administrator. *Casey v. Uddeholm*, 32 F.3d 1094, 1099 n. 4 (7th Cir.1994); *Deal v. Prudential Ins. Co. of America*, 222 F.Supp.2d 1067, 1070 (N.D.Ill. 2002).

Based on our *de novo* review of the record, we must find that the plaintiff is entitled to summary judgment. The medical evidence reveals disc protrusion or bulging at two

locations in plaintiff's cervical spine, with attendant radiculopathy. There are further medical findings to support the existence of plaintiff's condition, such as decreased sensation, slight atrophy, decrease in grip and pinch strength, and positive Spurling's maneuver. A functional capacities examination detailed plaintiff's limitations in the use of his right arm and, more severely, his right hand.

Given that, the question becomes whether plaintiff can perform his job despite the documented limitations. The job requirements of an Urgent Care Physician are not part of the record. What is part of the record are the pronouncements of various physicians noting that plaintiff was, at first, limited in his ability to perform certain requirements of his job – suturing, for example – and eventually, unable to perform the material duties of his occupation.

Even acknowledging the absence of a description of an urgent care physician's duties from the record, we find the evidence also supports plaintiff's disability claim in light of the duties of a General Practitioner. The Dictionary of Occupational Titles, upon which defendant relies, indicates that a General Practitioner must have the ability to reach, handle, and finger frequently. The combination of medical evidence and vocational evidence shows that plaintiff cannot perform these activities due to the limitations that affect his dominant hand.

Defendant bases its denial of benefits to plaintiff on three points: that plaintiff's claim is based solely on his complaints of pain in his shoulder and neck; that Ms. Cassidy's and Dr. Hauptman's reviews of plaintiff's file support a denial; and that plaintiff's condition has not

12

changed since 1997, at which time he was able to work. (*Brief in Opposition to Plaintiff's Motion*, at 6). Taking these positions in turn, we note that defendant first argues that a claim for benefits requires objective evidence linking the symptoms to a condition that is disabling, citing *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir. 1994) and *Wilczynski v. Kemper National Ins. Co.*, 178 F.3d 933 (7th Cir. 1993). (*Brief in Opposition to Plaintiff's Motion*, at 8). Neither case, however, has much bearing on the record here. In *Donato*, the plaintiff was unable to submit evidence of her condition from a medical professional utilizing a recognized diagnostic methodology. 19 F.3d at 382. Similarly, in *Wilczynski*, an independent examination of the plaintiff revealed that "objective evidence of [] disease was barely present." 178 F.3d at 937. In the instant case, quite to the contrary, plaintiff's condition is readily demonstrated by objective evidence. An x-ray performed on July 9, 1997, showed mild degenerative changes at C5-6. (RSL 0172). On September 25, 1997, an MRI revealed degenerative disc disease at C5-6, with asymmetrical bulging and degenerative spondylosis with some encroachment on the right C5-6 neural foramen; slight asymmetrical bulging at C6-7 without neural foramen encroachment; and a prominent left posterior cervical lymph node. (RSL 0173). More recently, in April of 2000, an MRI demonstrated mild right paramedian disc protrusion at the C6-7 level with asymmetric endplate/uncovertebral joint spurring, causing mild right paramedian stenosis and right-sided neural foraminal narrowing. (RSL 0162). This was in addition to asymmetric right-sided endplate/uncovertebral joint spurring and associated disc bulge at the C5-6 level causing mild right paramedian stenosis and right-sided neural foraminal narrowing. (RSL 0162).

13

Thus, the record in this case, unlike the cases upon which defendant relies, includes objective evidence linking plaintiff's symptoms to a medical condition.

Next, defendant submits that its denial is supported by the vocational reports of Ms. Cassidy and the medical report of Dr. Hauptman. Defendant's reliance on these two documents, however, is less than convincing. Dr. Hauptman reported that plaintiff's claim was based solely on pain, despite the objective evidence of a disability in the medical record. He also seemed to rely on a medical assessment from 1998, when it is clear that plaintiff's condition was progressive and had deteriorated by 2000. Ms. Cassidy's report is also less than fully supportive of defendant's position, as it reveals and documents the limitations plaintiff suffers in the use of his hand for grasping and manipulation. And although Mr. Pare acknowledged that the job of General Practitioner, as opposed to that of an Urgent Care Physician, involved an ability to reach, handle, and finger on a frequent basis, he found plaintiff could do such work despite the evidence that he was unable to perform repetitive manipulations with his right hand. In short, this opinion evidence is unimpressive, and somewhat unsupported, as compared with the rest of the record, which supports plaintiff's claim.

Finally, defendant argues that the record fails to support plaintiff's claim of total disability insofar as it does not reveal a change in plaintiff's condition in March of 2000 that would explain his sudden inability to work. (*Brief in Opposition to Plaintiff's Motion*, at 7). Defendant points to Dr. Cascino's report of March 17, 1998, in which the doctor commented that plaintiff would "continue working full-time, with his only restriction being avoiding

14

procedures such as lacerations and the like." (RSL 168). An x-ray performed on July 9, 1997, showed mild degenerative changes at C5-6. (RSL 0172). On September 25, 1997, an MRI revealed degenerative disc disease at C5-6, with asymmetrical bulging and degenerative spondylosis with some encroachment on the right C5-6 neural foramen; slight asymmetrical bulging at C6-7 without neural foramen encroachment; and a prominent left posterior cervical lymph node. (RSL 0173). As noted previously, by April of 2000, about the time plaintiff claimed disability, the slight bulge at C6-7 had become a paramedian disc protrusion at the C6-7 level with asymmetric endplate/uncovertebral joint spurring, causing mild right paramedian stenosis and right-sided neural foraminal narrowing. (RSL 0162). This was specifically mentioned as a change in condition from the previous study. (RSL 0162).

Despite this evidence, defendant attempts to analogize plaintiff's case to that of the plaintiff in *Perlman v. Swiss Bank Long Term Disability Plan*, 195 F.3d 975 (7th Cir. 1999). The plaintiff *Perlman* was an attorney for a bank who sought disability benefits in September of 1994 due to injuries she suffered in an automobile accident in 1988. 195 F.3d at 976. Following the accident, plaintiff went on disability for a year, returned to work, and took shorter disability leaves in 1991 and 1992. *Id.* She was able to work full time from September of 1992 until September of 1994. *Id.* The court felt that plaintiff's successful performance of the job between 1992 and 1994 shows that the 1988 accident did not prevent her from working. 195 F.3d at 982.

There are few similarities, however, between *Perlman* and the instant case. The *Perlman* court noted that plaintiff was unable to submit any evidence that her condition deteriorated during 1993 and 1994. 195 F.3d at 982. Here, as already discussed, MRI evidence reveals deterioration of plaintiff's condition. The *Perlman* court was also swayed by the plaintiff's willingness to take previous leaves of absence:

> We can imagine circumstances under which it would be unreasonable to demand proof of a change in condition. Some disabled people manage to work for months, if not years, only as a result of superhuman effort, which cannot be sustained. Sometimes work beyond one's limitations is essential to maintain one's standard of living, or is the result of an effort to disguise one's limitations from friends and coworkers. Reality eventually prevails, however, and limitations that have been present all along overtake even the most determined effort to keep working. We can imagine a lawyer trying to carry on, to defy her limitations, in order to avoid abandoning the profession in which so much of her human capital and spirit is invested. But Perlman herself was willing to take long periods off from work between 1988 and 1992, and she did not argue . . . that her performance between 1992 and 1994 reflects a dogged effort that could not be continued. If Perlman were devoted to the workforce beyond her abilities, then likely she would have asked Swiss Bank for an accommodation under the Americans with Disabilities Act, but she did not do this.

195 F.3d at 983. This portion of the *Perlman* decision speaks volumes, and lends more support to plaintiff's entitlement to disability benefits than it does to defendant's denial of those benefits.

In the instant case, the plaintiff worked for several years with his condition, and for three years despite symptoms that limited the tasks he could perform. He carried on, without taking leave, and eventually did require accommodations in his work duties before he finally could not continue. The plaintiff seems to be the hypothetical individual the *Perlman* court

describes, an individual who would not have to provide evidence of a deteriorating condition. Yet, the plaintiff has been able to provide just such evidence. In the end, after review of the record and the parties' position, we find that this is a case where the defendant's decision was mistaken, and our *de novo* review convinces us that plaintiff is entitled to summary judgment.

## C. Fees and Interest on Award

Plaintiff also seeks prejudgment interest on his award of benefits retroactive to March 27, 2000, as well as attorney's fees. Whether to award an ERISA plaintiff pre-judgment interest is "a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 820 (7th Cir. 2002). There is a presumption in favor of prejudgment interest awards in ERISA cases. *Id.* Without such an award, compensation of the plaintiff is incomplete and the defendant has an incentive to delay. *Id.* Here, such an award is appropriate in order to make the plaintiff whole. The appropriate rate for prejudgment interest in ERISA cases is the prime rate, *Id.*, which has fluctuated since March 27, 2000, from a high of 9.5% to its current low of 4.25%.

ERISA allows a court, in its discretion, to award "a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1); *Fritcher*, 301 F.3d at 818. The Seventh Circuit has recognized two tests for analyzing whether attorney's fees should be awarded to a "prevailing party"" in an ERISA case. One is a five factor test, in which the court considers: (1) the degree of the offending party's "culpability or bad faith"; (2) the degree

17

of the offending party's ability to satisfy an award of attorney's fees; (3) the degree to which such an award would "deter other persons acting under similar circumstances"; (4) the amount of benefit conferred on all the plan members; and (5) the relative merits of the parties' positions. *Fritcher*, 301 F.3d at 819. The second test looks to whether a party's position was substantially justified. *Quinn v. Blue cross and Blue Shield*, 161 F.3d 472, 478 (7th Cir. 1998). The Seventh Circuit has suggested that both test ask essentially the same question: "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent." *Id.* In the instant case, we find that the defendant's consideration of plaintiff's claim counsel against an award of fees.

There is nothing in the record that would lead the court to suspect the defendant was out to harass the plaintiff. Defendant simply interpreted the evidence from its perspective. While insurers are obligated to evaluate claims competently and dispassionately, they remain free to resolve conflicts in the medical evidence, although these roles may be limited when review is *de novo*. *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003). It certainly cannot be said that the insurer here acted in bad faith: it was merely fulfilling its obligations. Indeed, the defendant gave plaintiff far more leeway than required in the time limits for submission of evidence. There is no indication that defendant did not consider plaintiff's claim seriously or treated his application cavalierly. Certainly, plaintiff could have gone a long way toward helping himself regarding the major issue in this matter if he had simply submitted some sort of official job description at the very beginning. Finally, we can see no way in which an award of attorney's fees would serve any deterrent

purpose in future claims. This is simply not a case where an award of attorney's fees is appropriate.

## III. CONCLUSION

For the foregoing reasons, the plaintiff's motion for summary judgment is GRANTED. Plaintiff to submit a calculation of retroactive benefits due based on the prime rate.

ENTERED: _____
**EDWARD A. BOBRICK**
**U.S. MAGISTRATE JUDGE**

**DATE:** March 18, 2003